## THOMAS PHILLPOTTS, RESPONDENT, *v.* H. G. BLAS-DEL, APPELLANT.

NEW TRIAL, WHEN TO BE GRANTED BY NISI PRIUS COURT. A judge who tries a cause should not hesitate to set aside the verdict, where there is a clear preponderance of evidence against it.

MINING LEDGE MAY HAVE SEVERAL NAMES. One and the same ledge may have two names, by which it may be known indifferently; and it may even become better known under a name derived from a subsequent and invalid location than under a name given it in an earlier and valid location.

SALE OF MINE BY ANOTHER NAME. When a person conveys a lode of ore, we have only to ascertain by the best means in our power what lode he meant; and if we can do so, it makes no difference that he has called it by a name illegitimately acquired by or applied to it.

NAME, HOW IMPOSED UPON LODE. Placing a notice of location headed with a certain name upon a lode of ore is to christen it with such name.

NOTICE OF LOCATION OF MINING CLAIM, WHERE TO BE POSTED. In order to hold a mining ledge, it is not necessary that the notice of location should be placed on the ore or any part of the vein or lode; it is sufficient if it be placed in such reasonable proximity and relation to the ledge as, in connection with the work done under it, to give notice to all comers what ledge is intended.

QUESTION OF WEIGHT OF EVIDENCE—DIFFERENCE BETWEEN NEW TRIAL MOTION AND APPEAL. A *nisi prius* judge has jurisdiction on motion for new trial to decide as a question of fact, whether the scale of evidence against a verdict preponderates over that in favor of it; and his decision setting it aside will not be reversed by the appellate court except for the more cogent reasons, such as conclusive preponderance of evidence in favor of the verdict.

PRESUMPTIONS IN FAVOR OF ORDER GRANTING NEW TRIAL. In favor of an order of a *nisi prius* judge, setting aside a verdict as against evidence and granting a new trial, the appellate court will assume every fact for which the court below finds a clear preponderance of evidence and which the appellate court can not find a clear preponderance against.

RELOCATION OF MINING CLAIM UNDER ANOTHER NAME. There is no law to prevent a person from relocating his own mining claim by a different name; and if he does so and then conveys it by the latter name, there is no reason why the existence of the former location should invalidate the deed.

BARGAIN AND SALE DEED—OPERATION OF STATUTE OF USES. When a person bargains and sells his land for money, which raises a use by implication to the bargainee, the limitation of a further use to another person is repugnant and therefore void in law; but, though not a use which the statute can execute, yet still it is a trust in equity which in conscience ought to be performed.

EJECTMENT—OWNER OF LEGAL TITLE PROPER PARTY PLAINTIFF. Where a deed of mining ground by grant, bargain, sale, remise, release, conveyance, and quitclaim was made to one person for the use and benefit of another: Held, that the former was the owner of the legal title and the proper party to maintain an action at law for a disturbance of the possession thereof.

APPEAL from the District Court of the Eighth Judicial District, White Pine County.

The facts are stated in the opinion. A verdict having been found in the court below for defendant and plaintiff's motion for new trial having been granted, defendant appealed from the order.

*Clarke & Lyon*, for Appellant.

I.   The court below erred in granting a new trial on the ground of insufficiency of evidence. The question is here, (as it was below) is the evidence sufficient in law? If there was some evidence to support the verdict, if there was a substantial conflict, then the new trial should have been denied.   4 Nev. 156, 304, 395.   This rule is not changed by the fact that the judge trying the cause set aside the verdict. The intendments, which ordinarily lie in support of the verdict, are not reversed or otherwise disturbed by the adverse decision of the judge.

II.   The new trial was granted because it was discovered there was no Colfax lode, and because the Colfax location notice was posted in reasonable proximity to the Ward Beecher lode.   We submit, however, that the Ward Beecher claim, which was in fact upon a ledge, was not conveyed by the mere fact that the Colfax claim, which was supposed to be on a separate ledge but which was in fact upon no

ledge, was conveyed. The reasonable proximity of the notice to the ledge can only be considered as evidencing the intention of the locator to take the ledge in question. But the intention to take the Ward Beecher ledge by the Colfax location, is conclusively negatived by the circumstance that it recognizes the Ward Beecher location, and is parallel to it, and by the circumstance that the locators claim the discovery of a ledge.

III. The proofs show that the plaintiff held the ground in suit (if at all) as agent and trustee of the Eberhardt and Aurora Mining Company Limited of London, England. The legal title vested in that company, and the action should have been prosecuted in its name. The common law was adopted by the legislature of Nevada, in 1861; and the statute of uses—(27 Henry VIII) which was enacted before the emigration of the colonists to America, was adopted as a part of the common law. 4 Kent, 299; 1 N. H. 237; 3 N. H. 239; 4 Mass. 136; 6 Mass. 31; 3 Binney, 619; 10 John, 456, 505. Under the operation of the statute of uses we claim that Phillpotts, under the deed, was the trustee of an executed trust; that the legal estate conveyed to him was immediately vested by the statute in the cestui que trust, to wit: the Eberhardt and Aurora Company; and that therefore the action should have been brought in the name of that company.

IV. Blasdel's deed to Drake does not put the title out of Blasdel. As to the Ward Beecher, it is admittedly void for uncertainty. But the mention in the deed of the Ward Beecher excludes the idea that the Ward Beecher was intended to be conveyed under the name of Colfax; and if not intended to be conveyed as Colfax and not suficiently described as Ward Beecher, how could the Ward Beecher ledge be conveyed in that deed?

V. The Ward Beecher location is oldest in time and therefore first in right. It is on the ore channel or lode described in the proofs, and is the only ledge shown to exist. As there is but one lode, and that is the Ward Beecher, there can be no Colfax lode, unless the Ward Beecher is known by the name of Colfax, which is not shown nor

attempted to be shown. The Ward Beecher lode cannot pass by the name Colfax unless it was so known and intended. It was not so known and intended, therefore it did not pass.

VI. There can be but one valid location or perfect legal title to the same mining ground, claim, or lode, within the same area. It follows, of necessity and conclusively, that if the Ward Beecher is a valid location, the Montrose, Colfax, and Barris & Sproul, if located on the same lode and within the same area by the same parties, are void. It follows, with equal certainty, that if (as admitted) the Ward Beecher location and title were perfect, no other title could be acquired to the Ward Beecher claim or lode, in virtue of the subsequent location of the Colfax, Montrose, or Barris & Sproul on the Ward Beecher lode, as such. And as no legal title could be acquired by a second and void location on the same lode within the same area, *a fortiori* no valid title could be acquired to the Ward Beecher lode, previously located, by the subsequent location of supposititious or imaginary lodes within the same superficial area.

*Thomas Wren* and *F. W. Cole,* for Respondent.

I. The weight of evidence need not be so decided and great, to authorize a *nisi prius* judge to set aside a verdict, as is required by an appellate court. Such appears to be the doctrine laid down in all the books; and an appellate court will not interfere with the order of the court below unless in the trial of the case some legal principle was violated, which would have been fatal had the respondent gained the verdict. See *State* v. *Yellow Jacket M. Co.* 5 Nev. 415.

II. Phillpotts is the proper party plaintiff to the action. The legal estate is vested completely in him as trustee, and there is no limitation in time to the estate; in fact no limitation whatever, except that the trustee holds it for the benefit of the Eberhardt and Aurora Company. There might be perhaps a controversy between the trustee and the *cestui que trust* as to the status of each one in this matter; but as far as third parties are concerned plaintiff is

the trustee of an express trust, and is entitled to sue.    The
person having the legal title, or one who has had possession
and been ousted, is the only person who can sue in eject-
ment.    See 4 Denio, 385; 1 Hill on Trustees, 753; *Tyler* v.
*Houghton*, 25 Cal. 29; *Consideraut* v. *Brisbane*, 22 N. Y. 389;
Stats. 1861, 19; Cruise's Digest, Title 12, C. 4, S. 4; *Binney* v.
*Blumsley*, 5 Ver. 500.

III.    If the English statute· of uses be in force. in this
State which we deny, for our statutes recognize "trusts and
powers over and concerning lands," still there was no com-
mon law use created by the deed under consideration.    The
fee was conveyed to Phillpotts and the use to the corpora-
tion.    A trust is always created when, by the terms of the
deed, it can be inferred; or, in the language of the supreme
court of California, in *English* v. *See Yup Co.*, 17 Cal. 44,
"A deed of bargain and sale may be upon trust in favor of
a third party, if words expressive of that intent be used."

IV.    The deed from Blasdel to Drake conveyed the prem-
ises.    The first description, under the name of ·the Ward
Beecher, was defective; but the second was good, as the
premises can be made certain and identified.    It is shown
that the Ward Beecher, Colfax, and Montrose claims are one
and the same, or in other words that they are all in the
same body or deposit of ore.    Blasdel's deed to Drake there-
fore did not pass a name or a "supposititious ledge," any
more than a deed to land passes imaginary land or castles
in the air: it passed just what it purported to pass—all his
"right, title, interest, and estate."    See 9 N. Y. 49; Stats.
1861, 21.


By the Court, GARBER, J.:

This is an appeal from an order granting a new trial.    The
grounds upon which it was granted are thus stated by the
district judge: "This is an action brought to recover pos-
session of twenty feet of the Ward Beecher ledge, lying
immediately south of a line drawn east and west through a
point at the south side and east end of the Ward Beecher

cut. The jury gave a verdict for the defendant, and the plaintiff now moves for a new trial, on the sole ground that the evidence is insufficient to justify the verdict.

"The Supreme Court of this State (in 5 Nev. 422) has very clearly laid down the rule that ought to guide a district judge in passing upon a motion for a new trial, based upon this ground. 'The judge who tried the cause should not hesitate to set aside a verdict, where there is a clear preponderance of evidence against it.' I shall proceed, therefore, after a preliminary statement of the case, to consider, first: what facts have been established by a clear preponderance of evidence, and, second: whether or not the verdict is consistent with the facts so established. In finding the facts, I shall confine myself as strictly as possible to the statement which has been agreed upon by the attorneys, although I find, after an examination of it, that the statement is very imperfect. Much that I deem important is altogether omitted; much that it contains is unintelligible to one who did not witness the trial; and several matters included might as well have been omitted.

"Having heard all the testimony twice, and two arguments of the case, it is certainly difficult, and perhaps impossible, entirely to escape the influence of impressions already fixed. I shall endeavor, however, to look alone to what the statement contains, and to interpret it solely by its own light. It is agreed, on the first page of the statement, that the plaintiff was in possession of the ground in controversy on the third day of July, 1871; that, on or about that date, the defendant entered thereon, took possession thereof, and commenced mining and 'extracting ore therefrom, and was so continuing to do and holding the ground adversely to the plaintiff at the date of the commencement of this action. The contest between the parties was solely as to the right to the possession. Whichever was entitled to the possession at the date of the commencement of this action was entitled to a verdict. It was conceded that the defendant had the title to the ground in September, 1869, acquired by purchase from the original locators. The plaintiff claimed that the

defendant, by his deed to Drake of September 25, 1869, had conveyed the ground to Drake, and that by subsequent conveyance from Drake to Roberts, and from Roberts to the plaintiff, the title had vested in him.

"The defendant contended that he had not conveyed the ground to Drake, and, therefore, that the title was still in him. There was no dispute as to any other link in the chain of title, and the case, as submitted to the jury, depended solely upon the question, whether or not Blasdel conveyed the ground in controversy to Drake by the deed of September 25, 1869. If he did the verdict was to be for the plaintiff, if he did not for the defendant. The defendant, it is true, relied upon some special matters in defense under which he claimed to recover, even though it should be held that he had originally conveyed the ground to Drake. But these defenses were excluded. The offer to prove them was overruled; and, as the matters were not gone into, it can not now be known that the defendant would have made even a *prima facie* case on his offer, or that the plaintiff would not have successfully rebutted any evidence which he might have submitted. The mere offer to prove can not, therefore, affect the merits of this motion. If the questions of fact which were submitted to the jury were erroneously decided, the plaintiff is entitled to a new trial.

"The decision of this motion, then, depends upon the question whether the deed from Blasdel to Drake effected a conveyance of 'that twenty feet of the Ward Beecher ledge, lying immediately south of a line drawn east and west through a point at the south side and east end of the Ward Beecher Cut.' The material portion of the description contained in the deed in question is as follows: 'All that portion of the claim known as the Ward Beecher, commencing at the south side and east end of a long cut running easterly and westerly, generally known as the Ward Beecher Cut. Also all my right, title, and interest in the Montrose, *Colfax*, and Barris & Sproul lodes, lying south of a due east and west line drawn from the south side and east end of the above mentioned cut,' etc. The plaintiff concedes that

nothing was conveyed by this deed under the *name* of Ward Beecher, on account of incurable defect in that portion of the description.    But, as Blasdel clearly does convey all his right, etc., to the Colfax lode south of the line which is the northern boundary of the ground sued for, the plaintiff claims that Drake acquired title to all of the Ward Beecher ledge south of that line, for the reason that, what Blasdel and Drake called the Colfax lode was and is, in fact, nothing else than the Ward Beecher ledge.

"The position of the plaintiff, stated in general terms, is this: there is a lode or ledge—a connected deposit of silver bearing ore and concomitant vein matter—extending north and south through Treasure Hill, a distance of four hundred feet and over.    It does not crop out on the surface in the shape of solid ore, but at different points the surface presents indications of its subterranean existence in the shape of vein matter cropping out—that is, by the occurrence at the surface of small bunches of ore, mixed with the vein matter of the district, broken lime, and spar.    In 1867, before the ground was at all developed, Barris and Sproul posted the Ward Beecher notice on these croppings, near the north end of the lode, claiming by location six hundred feet of that ledge, three hundred feet north and three hundred feet south from the location monument, which stood at the south side and west end of the present Ward Beecher Cut.    This notice was recorded and the claim perfected by compliance with the mining laws as to work, etc.

"Afterwards, in June, 1868, Barris and Sproul, and Hart and Harps posted the Colfax notice, at a point three hundred and twenty-five feet south of the Ward Beecher monument, on the croppings of the same lode.    The ground being still undeveloped, the identity of the lode was not known, although it may have been suspected.    The locators, however, claim a thousand feet—Hart and Harps taking six hundred, including the discovery claim, south from the monument, and Barris and Sproul the remaining four hundred feet, north from the monument.    The Colfax monument is a few feet south of the south end of the Ward Beecher claim;

but the four hundred feet claimed by Barris and Sproul extends north beyond the ground in controversy. The Colfax notice is recorded, and Hart and Harps do a large amount of work under it, near the point of location, sinking the south Colfax shaft, running a drift, etc. After this, Barris and Sproul convey both claims to Blasdel. Blasdel does work at both locations and under each claim, calling the lode the Colfax at one point and the Ward Beecher at the other. Then he conveys all his right, etc., to the Colfax lode to Drake. Subsequently it transpires that the Ward Beecher lode and the Colfax lode are one and the same thing. The plaintiff contends that, although this discovery reduces the Colfax location as a basis of right to the ground to a nullity, it does not impair the effect of the conveyance of the lode, nor prevent the name of Colfax from having been, at the date of the conveyance, a good means of description of the lode. The defendant conveyed a lode or deposit of ore, not a right derived from the Colfax location. He owned that lode under the Ward Beecher location, but he conveyed it by the name given it in the Colfax location.

"The defendant disputes not only the facts out of which the plaintiff frames his hypothesis, but also the correctness of the legal conclusion. Upon the latter point, if I have understood him correctly, he contends that, if the Colfax was located on the same ledge claimed under the Ward Beecher notice, the Colfax location was a mere nullity for two reasons, viz: Barris and Sproul were incapacitated by their previous location from making any further claim on that ledge, and Hart and Harps, by locating a discovery claim on a previously discovered ledge, committed a fraud on the policy of the law which rendered the whole claim utterly void. Consequently, the Colfax lode never had an existence, and nothing could pass by conveyance under that name. Moreover, it already had the name of Ward Beecher and continued to retain it, and could not, therefore, be called the Colfax; and, further, all proof of the identity of the two ledges is incompetent, because it tends to vary and contradict the terms of written instruments, to wit, the notices of

location and the deeds, in which the lodes are spoken of and treated as distinct. I can not appreciate the force of these objections. There is no solecism involved in the idea that the same ledge may have two names by which it may be known indifferently, especially when it is not known that the parts of the ledge to which the different names are applied are identical; nor is it absurd to suppose that a ledge might become as well or better known under a name derived from an invalid and subsequent location than under that given it in the earlier and valid location. As to the deed and notice, they prove, at most, that, at the time they were made, the Colfax and Ward Beecher were considered distinct; and certainly it is not incompetent, for the purpose of giving proper effect to them, to prove that it has since been discovered that the claims are on the same ledge.

"I agree with the plaintiff that when a man conveys a lode we have only to ascertain, by the best means in our power, what lode of ore he meant; and, if we can do so, it makes no difference that he has called it by a name illegitimately acquired—a name only applied to it by reason of his ignorance of the truth. Effect must be given to his real intention, and the lode intended must be held to have been conveyed. Do the facts sustain the plaintiff's hypothesis? Without referring to any particular portion of the testimony, I presume that it will not be disputed that the statement and the maps referred to and made part of it, show that two immense chambers have been excavated from almost solid milling ore—the one connected by a shaft and cut with the Ward Beecher location and embracing the ground in controversy, the other commencing at the bottom of the Colfax shaft.

"Although bodies of lime and spar may have been found in these chambers among the ore, there is no dispute as to the ore in the respective chambers having been connected and continuous. The only question is whether the two chambers are on the same body of ore, that is, whether ore is continuous between them. As they are not actually connected by any drift or other workings, this is necessarily a

matter of inference, to be determined by the opinion of experts and natural probabilities. The north chamber connected with the Ward Beecher location has been excavated towards the north some distance beyond the point of location and, in the opposite direction, nearly half way to the Colfax. The chamber under the Colfax shaft is worked out a considerable distance to the south of that shaft, and towards the north to within twenty-five feet, horizontal measurement, of the nearest point in the Ward Beecher chamber. That is to say, for a distance north and south of about four hundred feet two large continuous bodies of ore are found approaching each other, with a space of twenty-five feet of unexplored ground between. In regard to that space of unexplored ground, what inference shall we adopt? Is it ore and vein matter, or is there a solid barrier of country rock interposing between two distinct bodies or deposits of ore? I think there is a very decided preponderance of evidence in favor of the identity.

"It is true that it is shown that a spar-seam crosses the south end of the Ward Beecher chamber. What inference it is expected will be drawn from the mere proof of this spar-seam, I do not know. There is no evidence in the statement as to what a spar-seam is or indicates. No witness swears that it constitutes a division between lodes in general, or in this instance; and, if we assume that we know no more about it than the statement discloses, then its existence proves nothing. But if, on the other hand, we may take notice of its character independent of testimony as a matter of common notoriety, then we know that the spar of this district—calc-spar—is simply crystallized carbonate of lime. The original solid lime-rock is dissolved in water, carried into every accessible cavity or fissure, and crystallizes in coarse crystals, filling the cavity, and is called spar. It is necessarily of comparatively recent formation; and, where a seam of it is found cutting across the country with ore contiguous to it on either side, the plain and inevitable inference is that, at some epoch subsequent to the deposit of the body of ore, a fissure occurred which in process of

time has been filled with the spar. Of course, therefore, its existence is no impeachment of the identity of the bodies of ore in which it occurs. The fact that the rock behind this spar-seam contains but little ore, proves nothing. The testimony is that the Ward Beecher chamber is on a level; and the map shows that, at the south end it breaks out to the surface, while at the whim shaft the bottom of the chamber is ninety feet deep. The memoranda connected with Attwood's assays show that the deepest point from which he took specimens at the south end of the Ward Beecher chamber, was forty-five feet from the surface. From this slight testimony, which is all I can find in the statement bearing on the point, the truth may be inferred— that the hill slopes from the north to the south, and that the farther south you go on the Ward Beecher chamber the nearer you approach the surface. Bearing this in mind, it will not appear surprising, but on the contrary most natural, that the testimony should show that the ground back of the spar-seam—near the surface as it is—is composed of debris, broken lime, spar, and surface dirt, mixed with a little ore. Such is the character of the surface from one end of the claim to the other. It is vein matter, but not solid ore. It is seventy-four feet from the mouth of the Colfax shaft to the top of the 'lady's chamber,' and solid ore is not found in that shaft till you reach within nine feet of the top of the chamber—the rest of the shaft passes through a debris of broken lime, spar, etc., mixed with occasional bunches of ore.

"The testimony introduced by the defendant as to the want of connection between the location point of the Montrose, and the ore in the Montrose shaft—which are, respectively, a few feet north and south of the Ward Beecher cut—shows that the surface about the Ward Beecher cut is of the same character, and that it is at some depth that milling ore is encountered at that point. - The numerous shafts sunk throughout the distance between the Ward Beecher and the Colfax and the proved depth of some of them and the depth of the large chambers out of which milling ore has

been taken, in the absence of more direct testimony, prove satisfactorily two things, which in point of fact are true, that the solid milling ore does not come to the surface and that the vein matter does. For, if the ore came to the surface, it would be worked from the surface; and the shafts would not have been sunk if the vein matter had not cropped out to indicate the existence below of something to sink for. I consider myself amply warranted in finding that it is established by a clear preponderance of testimony, that there is one lode or deposit of ore extending from north of the Ward Beecher location to the south of the Colfax.

"In November, 1867, Barris and Sproul located the Ward Beecher by posting the notice on a monument, erected at the west end and south side of the Ward Beecher cut. They recorded and perfected their claim by full compliance with the mining laws and acquired a perfect title to six hundred feet of the lode, extending three hundred feet to the north and three hundred feet to the south from the monument. Afterwards, on the twenty-seventh of June, 1868, in conjunction with Hart and Harps, they located the Colfax—Barris and Sproul taking the four hundred feet to the north of the notice, and Hart and Harps taking the six hundred feet, including the discovery claim, to the south. There is some conflict of testimony as to the exact point of the Colfax location. But it is immaterial where exactly it was made. Taking the defendant's own testimony, which I shall adopt on this point, it was about three hundred and ten feet south of the Ward Beecher monument, ten feet east and ten feet north of the south Colfax shaft, and twenty-five feet south of the north Colfax shaft. This location was recorded and perfected by work done by Hart and Harps; or, if their work did not apply to the north end, then by work done by Blasdel after his purchase. Barris and Sproul then sold the Ward Beecher and Colfax claims, together with the Montrose and the Barris & Sproul, to Blasdel. (Deed of Oct. 8, 1868.) Blasdel then commenced work on the ground, and, prior to his sale to Drake in September,

1869, had made some slight developments.  The testimony
as contained in the statement does not show with any clear-
ness the state of development of the ground at the date of
that deed.  This is to be regretted, as it is desirable in en-
deavoring to arrive at the intention of the parties to place
ourselves as nearly as possible in their shoes, to know
what they knew, to be ignorant of all they did not know, to
see the ground as they saw it.

"We can only gather from the statement that a slight
amount of surface work had been done in the vicinity of the
Ward Beecher cut..  That cut had been made and some
other open cuts or trenches, and the Autumn shaft had been
started.  At the Colfax, Hart and Harps had sunk the
south Colfax shaft, finding ore at a depth of twelve feet,
and had run a little drift from the bottom of the shaft to the
south.  Blasdel had commenced the north Colfax shaft,
(I take his own testimony on this point.)  It does not ap-
pear to what depth it had reached; but Blasdel says he had
commenced sinking it—that he was sinking for a ledge and
doing it for the Colfax.  Down the hill to the west, Blasdel
had sunk the Ward Beecher shaft ' all the way down,' that
is, I suppose, to its present depth.

"This is about all we can gather as to the state of develop-
ment on the ground at the date of the deed.  Under these
circumstances, Blasdel conveyed to Drake all his right, etc.,
to the Colfax lode, etc.  What lode ?  What deposit of ore
did he have in his mind when he said Colfax lode ?  The
notice of location of the Colfax claim was headed ' Colfax
Lode.'  Placing it upon a lode was to christen it by that
name.  Blasdel himself had commenced a shaft which he
called the ' North Colfax Shaft '; he was sinking it for a
ledge; he was doing the work in connection with the Colfax
location, and for that claim.  When, therefore, he spoke of
the Colfax lode, could any body doubt what lode he meant?
Is it not apparent that he meant that lode on which or for
which he was sinking ?  If there could be any doubt of his
meaning, is not that doubt resolved by the fact that Drake
immediately went into possession of that lode, and that

Blasdel acquiesced in that possession and that of his grantees for nearly two years? It seems to me that the case is too plain to be better illustrated than by its bare statement. But for the fact that counsel have so strenuously argued and that a jury has found to the contrary, I should have thought no elaboration of the view I have taken necessary.

"Much testimony was introduced as to the character of the ground between the Montrose location and the solid ledge, and also as to that between the top of the Colfax shaft and the 'lady's chamber.' The testimony of the defendant's witnesses was, that there was no ore connection between the location monuments and the ore chambers nearest to them. The plaintiff's witnesses swore to a vein connection—a connection in vein matter. The witnesses all agree that the vein matter of the district is broken lime, spar, and quartz mixed; that lime and spar are found mixed with the richest ore and often in considerable quantities; in other words, that portions of ledges, sometimes greater, sometimes less in extent, are barren. It is not, however, a very material question whether there is an ore connection or not between the surface where the Colfax notice was posted and the ore chambers beneath. In order to hold a ledge, it is not necessary that the notice should be placed on the ore or any part of the vein or lode. It is sufficient, as the jury was instructed, if the notice is placed in such reasonable proximity and relation to the ledge, as in connection with the work done under it to give notice to all comers what ledge is intended. Here is the case of a ledge, deep in the ground, not appearing at the surface in the shape of solid ore, but only in vein matter. There is, on the surface, broken lime, spar, debris, mixed with small quantities (occasional bunches) of ore. This was deemed by the locators of the Ward Beecher and Colfax, and the event proves with reason, a good indication of a ledge beneath—if not a ledge itself. They made their locations on these croppings and sank shafts for the ledges. Can any court go to the length of holding that the notices

and the work did not give reasonable notice as to what ground was claimed? If it could be so held, what would become of the Ward Beecher claim itself ? * * * * * These views, if correct, are in my opinion conclusive. * * * * * * * I think a new trial ought to be granted, and it is so ordered.

W. H. BEATTY, D. J."

To show that this order should be affirmed, I think but little need or can be added to the foregoing very able and perspicuous statement. The correctness of its exposition of the facts and testimony is not assailed; but it is argued "that the question is here—as it was below—is the evidence insufficient *in law ;* that it is error to grant a new trial upon the ground of insufficiency of the evidence, where there is a substantial conflict of testimony, for the jury and not the court must respond to questions of fact." I do not so understand the law. By a rule almost coeval with the maxim quoted—certainly one as deeply rooted in the law—the *nisi prius* judge has jurisdiction, on motion for a new trial, to decide, as a question of fact, whether the scale of evidence which leans against the verdict very strongly preponderates. 3 Black. Com. 392. It is not enough to authorize the appellate court to reverse such decision, that the evidence appears fully to support the verdict. It will only be reversed for the most cogent reasons, such as a conclusive preponderance of evidence in favor of the verdict. 21 Cal. 414; 21 Iowa, 337.

I understand the counsel for the appellant to contend for such a preponderance on one point only, viz: the intention to take the Ward Beecher ledge by the Colfax location. This intention, it is argued, is conclusively negatived by the circumstances, that the Colfax recognizes the Ward Beecher location and is parallel to it and that the locators claim the discovery of a ledge. If these circumstances are conclusive of any thing, it is that the locators of the Colfax believed it to be a newly-discovered and unappropriated vein—not of the absence of an intention to locate it in consequence of such belief. In fact, Sproul swears that the Colfax was

located for the protection of the Ward Beecher and was located and worked under the impression that they were one and the same.    There is nothing in the fact that a discovery claim was taken by Hart and Harps to conclusively impeach this statement of Sproul.    The Colfax notice reads:

" COLFAX LODE.

" We, the undersigned, claim 1000 feet on this lode, 600 ft. south, 400 ft. north from this monument.

|  "South. | North. |
|---|---|
| " H. Harps, 300. | L. Barris, 200. |
| " L. J. Hart, 300. | E. R. Sproul, 200." |

Barris and Sproul did not become tenants in common with Hart and Harps of the whole one thousand feet.    They attempted to acquire a segregated claim of four hundred feet running north.    Their title to this could not be vitiated by reason of any excess in the number of feet claimed by Hart and Harps.    Barris and Sproul took up just the number of feet they had a right to take on the hypothesis that they were making a relocation.

In favor of the order, we must assume every fact which the district judge finds a clear preponderance of evidence for and which we cannot find a clear preponderance against. We must, therefore, assume, at least, that the Colfax notice was posted within a few feet of the shaft upon which the first work was done under it; that before the deed in question was executed, this shaft had been sunk ten or twelve feet and a drift run in the ledge; that, from the very top of it, it was within the walls of the ledge or the lateral boundaries of the deposit, and that this work was done for the purpose of holding this ledge.    Upon this assumption of fact, we cannot say, as an inference of law, that this was not a location—in fact and in intention—of the 300 feet of the ledge in dispute, lying next south from the Ward Beecher location monument; that the title so acquired would not have sustained an ejectment against a subsequent appropriation of even date with said deed, and a recovery thereby of that 300 feet of this very ledge, as and because it was the Colfax

ledge; nor that said 300 feet would not pass by conveyance as part of the same.    There is no law to prevent a party from relocating his own claim by a different name; and if he does so and then conveys it by the latter name, I can see no reason why the existence of the former location should invalidate the deed.    Of course, he can not thus acquire title to more ground than the law allows him to locate.    But that which he had a right to relocate would pass by the deed, notwithstanding the nullity of the relocation to the extent of the excess.    However, it is only necessary in this case to affirm the ruling that, by the Colfax location, this ledge acquired a name and description by which it could be conveyed.

The deed from Roberts to Phillpotts, for and in consideration of fifty thousand dollars in hand paid, grants, bargains, sells, remises, releases, conveys, and quitclaims the premises described, to have and to hold to said Phillpotts, for use and benefit of the Eberhardt and Aurora Mining Company.    It is contended that the legal title vested in said company and that, therefore, the action should have been prosecuted in its name.    The argument is that, having adopted the common law, the English statute of uses, passed before the colonization of America, is here in force and by it the use was executed.    The position that the statute of uses is part of our law is supported by an imposing array of authority; but, if this is to be considered as a deed of bargain and sale, it is clear that the legal title remained in Phillpotts.    In the language of Blackstone, no use can be limited on a use, and when a man bargains and sells his land for money, which raises a use by implication to the bargainee, the limitation of a further use to another person is repugnant and therefore void; but, though not a use which the statute can execute, yet still it is a trust in equity, which in conscience ought to be performed.    3 Com. 336; 5 Wallace, 282; 17 Cal. 44.

The rules laid down in respect of the construction of deeds, says Lord Mansfield, are founded in law, reason, and common sense that they shall operate according to the

intention of the parties, if by law they may; and if they cannot operate in one form, they shall operate in that which, by law, will effectuate the intention. If this had been simply a feoffment with livery, or a release to one already clothed with an estate in possession, it may be that the company would have taken the legal title, even in opposition to the intention of the parties, on the principle that the will of the subject cannot control the express enactment of the legislature. But if our statutes have not rendered livery of seizin and possession in the releasee unnecessary to the respective efficacy of a feoffment and release, it is clear that we should construe this deed to be a bargain and sale, because in that way alone it can then have the operation intended, or any operation.

In some of the states statutes have been passed providing in terms that the feoffee shall be seized without livery and the releasee without possession, but I can find no such or equivalent provision in the statutes of this State. And on the supposition that the statute of uses is here in force, no inconvenience can result from the absence of such enactments. For a feoffment without livery or a quitclaim to one not in possession, would still pass the legal title, by raising a use, which the statute at once executes. 2 Smith's Leading Cases, 521. I am satisfied that this is the correct view, and that this is to be treated as a deed of bargain and sale, which by force of the statute of uses conveys the legal title to Phillpotts in trust for the company—a trust cognizable only in a court of equity.

But even if it can be held that the provision in our statutes for the recording of deeds dispenses with the common law requisite of livery of seizin and that the recording of a deed takes the place of livery and is equivalent to it, there is still sufficient authority that this action was well brought in the name of Phillpotts as the proper party plaintiff. For we would then have, as stated in *Matthews* v. *Ward, infra,* a deed capable of transferring the estate either as a feoffment, release, or bargain and sale—the operative words of each species of conveyance being used. The question then would be,

not whether, if it can not operate in one way, it shall in another; but what is the character of the deed in point of law? The intention of the parties was, undoubtedly, to vest the legal title in Phillpotts, otherwise the conveyance would have been made directly to the corporation. By law it may operate as a bargain and sale, and so to construe it will most effectually accomplish the intention of the parties. And such construction does no violence to the language used, which expresses an intention to convey the estate by means of a bargain and sale; or, as laid down in Smith's Leading Cases, the deed may be regarded either as a statutory grant, or as deriving its effect from the common law or the statute of uses, as will best subserve the object for which it was executed. *Matthews* v. *Ward's Lessee*, 10 G. & J. 448; *Guest* v. *Farley*, 19 Mo. 157.

According to Blackstone, the only service to which the statute of uses was consigned in England at the time of the colonization of this country, was in giving efficacy to certain species of conveyances; and that service we allow it to perform here, by acting once on this deed and executing the use created by it into a legal estate in Phillpotts.

I think the order appealed from should be affirmed.